IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| EDWIN J. RACHUBA, JR.,<br><br>    Plaintiff,<br><br>        vs.<br><br>MICHAEL J. ASTRUE,<br>Commissioner of Social Security,<br><br>    Defendant. | Civil Action No. 09-1401 |

## MEMORANDUM OPINION

### I.    INTRODUCTION

Pending before the Court are cross-motions for summary judgment filed by Plaintiff Edwin J. Rachuba, Jr., and Defendant Michael J. Astrue, Commissioner of Social Security.  Plaintiff seeks review of a final decision by the Commissioner denying his claim for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401 *et seq.*  For the reasons discussed below, Defendant's motion is denied and Plaintiff's motion is granted insofar as he seeks remand for reconsideration.

### II.   BACKGROUND

#### A.   Factual Background

Plaintiff Edwin J. Rachuba, Jr., was born on December 12, 1965.  After completing two years of college in 1989, he entered a five-year apprenticeship program to become a steamfitter, working to install heating, ventilating and air conditioning equipment. (Certified Copy of Transcript of Proceedings before the Social

Security Administration, Docket No. 3, "Tr.," at 21, 117, 121.) During his career, he also worked as a bricklayer's laborer for about three years. (Tr. 30-31, 117.)

For reasons which are not clear from the record, Mr. Rachuba ceased working as of March 2, 2005. In a letter written to the Social Security Administration in September 2006, Mr. Rachuba explained that he had been "stunned" when told by a neurosurgeon that he needed to change careers after 13 years as a steamfitter. He also stated that he had been "fighting [a] mental battle" with bipolar syndrome for nearly 16 years, a condition which caused extreme mood swings as well as "episodes of manic depression" and negatively affected his ability to work on a regular basis. (Tr. 144.)

Mr. Rachuba's mental conditions make it difficult for him to be isolated from other people and he experiences anxiety attacks when alone or in crowds, as well as road rage and confusion when he drives alone. (Tr. 32-34.) He has a physical condition known as a "dropped foot" which causes his right foot to go numb and to have periods "a couple of times a month" when he cannot pick up his foot. (Tr. 32.) He has been diagnosed with degenerative disc disease of his lumbar vertebrae; as a result he has intermittent episodes of pain in his buttock, thigh and calf. (Tr. 230.)

  B.  Procedural Background

      Plaintiff applied for a period of disability and

2

disability insurance benefits on August 30, 2006, claiming he was
unable to work as of March 2, 2005, due to disc disease disorder,
drop foot, bipolar and manic depression. (Tr. 115-122.) His
application was denied at the state agency level on October 31,
2006, the examiner having concluded that although Plaintiff could
not perform his past work as a steamfitter, there were other less
physically and mentally demanding jobs he could do.  (Tr. 61-62.)
Mr. Rachuba sought a hearing before an Administrative Law Judge
("ALJ") which was held by the Honorable Norma Cannon on May 16,
2008, in Morgantown, West Virginia.  On September 16, 2008, Judge
Cannon issued her decision, again denying benefits inasmuch as she
found Plaintiff could perform a limited range of sedentary or light
work despite his impairments.  (Tr. 7-16.)   The Social Security
Appeals Council declined to review the ALJ's decision on October 7,
2009, finding no reason pursuant to its rules to do so. (Tr. 1-3.)
Therefore, the September 16, 2008 opinion became the final decision
of the Commissioner for purposes of review.  42 U.S.C. § 405(h);
Rutherford v. Barnhart, 399 F.3d 546, 549-550 (3d Cir. 2005),
citing Sims v. Apfel, 530 U.S. 103, 107 (2000).  Plaintiff filed
suit in this Court on October 19, 2009, seeking judicial review of
that decision.

C.   Jurisdiction

This Court has jurisdiction by virtue of 42 U.S.C.
§ 1383(c)(3) (incorporating 42 U.S.C. § 405(g)) which provides that

an individual may obtain judicial review of any final decision of the Commissioner by bringing a civil action in the district court of the United States for the judicial district in which the plaintiff resides.

III. **STANDARD OF REVIEW**

The scope of review by this Court is limited to determining whether the Commissioner applied the correct legal standards and whether the record, as a whole, contains substantial evidence to support the Commissioner's findings of fact. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389 (1971); Schaudeck v. Comm'r of Soc. Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999). Findings of fact by the Commissioner are considered conclusive if they are supported by "substantial evidence," a standard which has been described as requiring more than a "mere scintilla" of evidence, that is, equivalent to "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson, id. at 401. "A single piece of evidence will not satisfy the substantiality test if the [ALJ] ignores, or fails to resolve a conflict, created by countervailing evidence." Kent v. Schweiker, 710 F.2d 110, 114 (3d Cir. 1983).

This Court does not undertake *de novo* review of the decision and does not re-weigh the evidence presented to the Commissioner. Schoengarth v. Barnhart, 416 F. Supp.2d 260, 265 (D. Del. 2006), *citing* Monsour Medical Center v. Heckler, 806 F.2d 1185, 1190 (3d

4

Cir. 1986) (the substantial evidence standard is deferential, including deference to inferences drawn from the facts if they, in turn, are supported by substantial evidence.)  If the decision is supported by substantial evidence, the Court must affirm the decision, even if the record contains evidence which would support a contrary conclusion.  <u>Panetis v. Barnhart</u>, CA No. 03-3416, 2004 U.S. App. LEXIS 8159, *3 (3d Cir. Apr. 26, 2004), <i>citing</i> <u>Simmonds v. Heckler</u>, 807 F.2d 54, 58 (3rd Cir. 1986), and <u>Sykes v. Apfel</u>, 228 F.3d 259, 262 (3rd Cir. 2000).

## IV. **LEGAL ANALYSIS**

### A.  <u>The ALJ's Determination</u>

In determining whether a claimant is eligible for a period of disability and to receive disability insurance benefits, the burden is on the claimant to show that he has a medically determinable physical or mental impairment (or combination of such impairments) which is so severe he is unable to pursue substantial gainful employment[1] currently existing in the national economy. The impairment must be one which is expected to result in death or to have lasted or be expected to last not less than twelve months.  42 U.S.C. § 1382c(a)(3)(C)(i); <u>Morales v. Apfel</u>, 225 F.3d 310, 315-316 (3d Cir. 2000).  A claimant seeking DIB must also show that he

---

[1]  According to 20 C.F.R. § 404.1572, substantial employment is defined as "work activity that involves doing significant physical or mental activities."  "Gainful work activity" is the kind of work activity usually done for pay or profit.

contributed to the insurance program, is under retirement age, and became disabled prior to the date on which he was last insured. 42 U.S.C. § 423(a); 20 C.F.R. § 404.131(a). The Commissioner does not dispute that Mr. Rachuba satisfied the first two non-medical requirements, and the parties do not dispute the ALJ's finding that Plaintiff's date last insured will be December 31, 2010.

To determine a claimant's rights to DIB,[2] the ALJ conducts a formal five-step evaluation:

(1)   if the claimant is working or doing substantial gainful activity, he cannot be considered disabled;

(2)   if the claimant does not suffer from a severe impairment or combination of impairments that significantly limits his ability to do basic work activity, he is not disabled;

(3)   if the claimant does suffer from a severe impairment which meets or equals criteria for an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings") and the condition has lasted or is expected to last continually for at least twelve months, the claimant is considered disabled;

(4)   if the claimant retains sufficient residual functional capacity ("RFC")[3] to perform his past relevant work, he is not disabled; and

(5)   if, taking into account the claimant's RFC, age, education, and past work experience, the claimant can

---

[2]   The same test is used to determine disability for purposes of receiving either DIB or supplemental security income benefits. Burns v. Barnhart, 312 F.3d 113, 119, n.1 (3d Cir. 2002). Therefore, courts routinely consider case law developed under both programs.

[3]   Briefly stated, residual functional capacity is the most a claimant can do despite his recognized limitations. Social Security Ruling 96-9p defines RFC as "the individual's maximum remaining ability to perform work on a regular and continuing basis, i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule."

perform other work that exists in the local, regional or national economy, he is not disabled.

20 C.F.R. § 404.1520(a)(4); *see also* <u>Morales</u>, 225 F.3d at 316.

In steps one, two, and four, the burden is on the claimant to present evidence to support his position that he is entitled to Social Security benefits, while in the fifth step the burden shifts to the Commissioner to show that the claimant is capable of performing work which is available in the national economy.[4]  <u>Sykes v. Apfel</u>, 228 F.3d 259, 263 (3d Cir. 2000).

Following the prescribed analysis, Judge Cannon noted at step one that Mr. Rachuba had not performed any substantial gainful employment after March 2, 2005, the alleged onset date of his disability.  (Tr. 12.)  Resolving step two in Plaintiff's favor, the ALJ concluded Mr. Rachuba suffered from bipolar disorder, degenerative disc disease of the lumbar spine, and depression, all of which were "severe"[5] as that term is defined by the Social

---

[4]  Step three involves a conclusive presumption based on the listings, therefore, neither party bears the burden of proof at that stage.  <u>Sykes</u>, 228 F.3d at 263, n.2, *citing* <u>Bowen v. Yuckert</u>, 482 U.S. 137, 146-147 n.5 (1987).

[5]  *See* 20 C.F.R. §§ 404.1520(c), 404.1521(a), and 140.1521(b), stating that an impairment is severe only if it significantly limits the claimant's "physical ability to do basic work activities," i.e., "abilities and aptitudes necessary to do most jobs, including, for example, walking, standing, sitting, lifting, pushing, pulling, reaching, carrying or handling," as compared to "a slight abnormality" which has such a minimal effect that it would not be expected to interfere with the claimant's ability to work, regardless of his age, education, or work experience.  <u>Yuckert</u>, 482 U.S. at 149-151.  The claimant has the burden of showing that the impairment is severe.  <u>Id.</u> at 146, n.5.

Security Administration.  Although the medical record showed that Plaintiff had also been diagnosed with drop foot, an anxiety disorder, and substance abuse disorder, Judge Cannon made no findings with regard to the severity of these conditions.  (Id.)

At step three, the ALJ concluded Plaintiff's impairments or combination of impairments did not meet or medically equal one of the listed impairments (Tr. 16) but did not identify the Listings to which she compared Plaintiff's symptoms and conditions.

The ALJ concluded at step four that Mr. Rachuba could not perform any of his past relevant work, specifically, steamfitter, pipefitter, bricklayer and construction helper.  (Tr. 14.)   This finding was apparently based on the testimony of Larry Ostrowski, Ph.D., a vocational expert ("VE"), who testified at the hearing that Plaintiff's previous work as a steamfitter (also referred to as a pipefitter) was a skilled, heavy job and his prior work as a bricklayer's helper would be considered heavy and semi-skilled; Plaintiff could not return to either of those occupations due to his physical and mental limitations. (See Tr. 51.)  Dr. Ostrowski further testified, in response to the ALJ's hypothetical questions, that Plaintiff could perform the representative occupations of an office helper, mail clerk, document preparer, table worker or sealer. (Tr. 15; see also Tr. 52-53.)  Accordingly, considering the

8

Plaintiff's age,[6] education, work experience, and residual functional capacity, the ALJ determined at step five that Mr. Rachuba was not disabled at any time between March 2, 2005, and the date of her decision and was not, therefore, entitled to benefits during that period.  (Tr. 15.)

B.    Analysis

On appeal, Mr. Rachuba's primary argument is that the record does not contain substantial evidence on which the ALJ could base her conclusion that Plaintiff could perform sedentary to light work.   He further argues that the ALJ improperly weighed the medical opinions of his treating physician and psychiatrist by giving greater weight to conclusions based only on a review of the record.   Because we conclude that the ALJ erred by failing to resolve a conflict between the opinion of Plaintiff's long-term treating psychiatrist and that of the Social Security examiner, by failing to explain the weight given to various medical opinions, and by improperly rejecting the opinion of Plaintiff's physician, we will remand for further consideration.   Our analysis begins with a summary of the ALJ's decision.

1.    *The ALJ's consideration of the medical evidence*

---

[6]   The ALJ found that Plaintiff was 42 years old on his alleged disability onset date.  (Tr. 14.)   That is incorrect, based on his birth date of December 12, 1965.   Since his disability onset date was March 2, 2005, he was actually 39 on the onset date and 42 years old on the date of the hearing.   However, this error is immaterial inasmuch as any applicant between the ages of 18 and 44 is considered to be a "younger individual" as that phrase is defined by the Social Security Administration.   20 C.F.R. § 404.1563.

*concerning Plaintiff's mental disorders:* Going sequentially through the ALJ's decision, we note the following:

- Judge Cannon first concluded that Plaintiff's bipolar disorder and depression were "severe" but that neither condition satisfied the Listings.[7] (Tr. 12.)

- After considering the evidence of record, she found Mr. Rachuba's "medically determinable impairments could reasonably be expected to produce the alleged symptoms; however, [his] statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the residual functional capacity assessment for the reasons explained below."[8]   (Tr. 13.)

---

[7]   It is unclear which Listings the ALJ considered.  The Third Circuit Court of Appeals has noted that to provide a complete analysis, the ALJ should "identify the relevant listed impairment(s)." Torres v. Comm'r of Social Sec., No. 07-2204, 2008 U.S. App. LEXIS 11558, *5 (3d Cir. May 29, 2008); *see also* Burnett v. Commissioner, 220 F.3d 112, 119-120 (3d Cir. 2000), remanding in part because the ALJ failed to identify the listed impairment, discuss any pertinent evidence, or explain his reasoning; *see also* Smith v. Barnhart, No. 02-1675, 2001 U.S. App. LEXIS 25441, *8 (3d Cir. Dec. 9, 2002), remanding because the ALJ failed to identify the evidence he relied upon at step three, failed to identify the specific listing(s) he utilized, and did not discuss medical equivalency or identify which elements were missing from which criteria of the listing(s).  However, the failure to identify a Listing, by itself, does not necessitate remand if the decision, "read as a whole, illustrates that the ALJ considered the relevant factors."   Jones v. Barnhart, 364 F.3d 501, 504-505 (3d Cir. 2004); *see also* Scatorchia v. Comm'r of Soc. Sec., No. 04-3626, 2005 U.S. App. LEXIS 11488, *7 (3d Cir. June 15, 2005) (while the ALJ need not use "particular language or adhere to a particular format," she does need to perform a proper analysis which clearly and fully evaluates the medical evidence and its effects on the claimant vis-a-vis the relevant listing.)  As discussed in the text above, it is impossible for the Court to determine here if the ALJ considered the relevant factors of the appropriate Listings because the quite complex criteria of Listings 12.04, 12.06 and 12.09 are never mentioned.

[8]   The ALJ put the cart before the horse in her assessment.  She stated that while Mr. Rachuba's medically determinable impairments could reasonably be expected to produce the alleged symptoms, his

- "The record does not show that the claimant is markedly impaired in the area of social functioning, concentration, stress tolerance or performance of activities of daily living."[9] (Tr. 13.)

- "As to his mental limitations, the claimant can understand, remember and follow simple job instructions (i.e. perform one and two step tasks), maintain regular attendance, be punctual, ask simple questions, accept instructions, function in production oriented jobs, and get along with others. In short, the claimant's mental limitations do not preclude [him] from performing the mental demands of work." (Id.)

---

statements regarding the intensity, persistence and limiting effects of his symptoms "are not credible to the extent they are inconsistent with the residual functional capacity assessment for the reasons explained below." (Tr. 13.) In determining a claimant's residual functional capacity, the ALJ is to consider "all evidence before him," and the combined effects of all the claimant's impairments, both severe and non-severe. The ALJ may exclude from the RFC any limitations which he does not find credible. Burns, 312 F.3d at 129. Here, the ALJ's statement seems to imply that she found certain of Mr. Rachuba's statements not credible because they were inconsistent with the RFC (which, as explained elsewhere, is never described), rather than finding certain statements about his limitations not credible for particular reasons, then excluding them from the RFC. At no point in her decision does the ALJ explain why she found certain statements not credible, that is, she failed to indicate the evidence she rejected and the evidence on which she relied as the basis for her credibility determination. See Schaudeck, 191 F.3d at 433 (where subjective symptoms are alleged, "the. . . decision rationale must contain a thorough discussion and analysis of the objective medical and the other evidence, including the individual's complaints of pain or other symptoms and the adjudicator's personal observations. The rationale must include a resolution of any inconsistencies in the evidence as a whole and set forth a logical explanation of the individual's ability to work.")

[9] We note for the record that as discussed in note 13 below, according to the B criteria of Listing 12.04 (affective disorders) and 12.06 (anxiety-related disorders), the claimant must satisfy two of four criteria, i.e., showing "marked" (i.e., more than moderate but less than extreme) restrictions in activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration. There is no criterion referring to "stress tolerance."

- In her summary of an October 24, 2006 report provided by Michael Crabtree, Ph.D., a one-time consultative examiner, Judge Cannon noted that her own residual functional capacity assessment[10] "differs from Dr. Crabtree's because the opinions contained in [his] report overestimate the severity of the claimant's restrictions. The examining source statements in the report concerning the claimant's abilities in the area of making occupational adjustments are not consistent with the medical evidence. It appears that Dr. Crabtree relied heavily on the subjective report of symptoms and limitations provided by the claimant. However, the totality of the evidence does not support the claimant's subjective complaints. Dr. Crabtree's opinion is without substantial support from the evidence of record and is given appropriate weight as such (Exhibits 2F;3F.)"[11] (Tr. 13.)

- The ALJ continued, "Exhibit 7F[12] details the claimant's individual psychotherapy for depression and substance abuse. Progress notes indicate that the claimant reported irritability, loss of interest in activities, memory problems and difficulty accepting his life." (Tr. 13-14.)

- Finally, the ALJ considered a report provided on February 11, 2008, by Plaintiff's treating physician, Dr. A. J. Cipriani, in which he stated that Mr. Rachuba "is emotionally unbalanced and experiences anxiety, decreased attention, memory loss and irritability despite treatment with medication. As a result, Dr. Cipraini [sic] stated that the claimant was unable to work. . . .Exhibit 12F [Dr. Cipriani's report] prepared for the claimant's attorney is rejected as Dr. Cipraini

---

[10] The Court has been unable to identify any explicit statement by the ALJ of Mr. Rachuba's RFC.

[11] Exhibit 2F (Tr. 184-187) is a Mental Residual Functional Capacity Assessment dated October 30, 2006, from Roger Glover, Ph.D. and Exhibit 3F (Tr. 188-196) is Dr. Crabtree's report.

[12] Exhibit 7F (Tr. 220-229) contains progress notes for the period April 22, 2005, through August 31, 2006, from Psychiatric Care Systems, including medication checks by Dr. Urrea and psychotherapy notes by Dr. Valinsky.

[sic] is not a mental health professional and his
opinion is inconsistent with the evidence of
record." (Tr. 14.)

2. *Relevant law:* Social Security regulations identify
three categories of medical sources – treating, non-treating, and
non-examining. Physicians, psychologists and other acceptable
medical sources who have provided the claimant with medical
treatment or evaluation and who have had an "ongoing treatment
relationship" with him are considered treating sources. A
non-treating source is one who has examined the claimant but does
not have an ongoing treatment relationship with him, for example,
a consultative examiner who is not also a treating source.
Finally, non-examining sources, including state agency medical
consultants, are those whose assessments are premised solely on a
review of medical records. 20 C.F.R. § 404.1502.

Social Security regulations also carefully set out the manner
in which medical opinions are to be evaluated. 20 C.F.R.
§ 404.1527(d). In general, every medical opinion received is
considered. Unless a treating physician's opinion is given
controlling weight, the ALJ will consider (1) the examining
relationship (more weight given to the opinion of an examining
source than to the opinion of a non-examining source); (2) the
treatment relationship (more weight given to opinions of treating
sources); (3) the length of the treatment relationship and the
frequency of examination (more weight given to the opinion of a

13

treating source who has treated the claimant for a long time on a frequent basis); and (4) the nature and extent of the treatment relationship (more weight given to the opinions of specialist than to generalist treating sources.) 20 C.F.R. § 404.1527(d); see also Mason v. Shalala, 994 F.2d 1058, 1067 (3d Cir. 1993) (it is well-established that an ALJ "must give greater weight to the findings of a treating physician than to the findings of a physician who has examined the claimant only once or not at all.") The opinions of a treating source are given controlling weight on questions concerning the nature and severity of the claimant's impairment(s) when the conclusions are "well-supported by medically acceptable clinical and laboratory diagnostic techniques and [are] not inconsistent with the other substantial evidence in [the] record." 20 C.F.R. § 404.1527(d)(2).

   3.   *The report of Dr. Roger Glover:* Although mentioned only in passing, the evidence on which the ALJ apparently relied in determining Plaintiff's mental health limitations was the report of Roger Glover, Ph.D., a Social Security Administration examiner who completed a Psychiatric Review Technique form (Tr. 170-183) and a Mental RFC Assessment (Tr. 184-187) on October 30, 2006. His report was based only on Plaintiff's medical file at that time, i.e., the evaluation by Dr. Crabtree and the reports from Psychiatric Care Systems ("PCS"), a practice which provided psychotherapy and medication for Mr. Rachuba. (Tr. 182.) Dr.

Glover concluded that Plaintiff's mental conditions were best described by Listings 12.04, affective disorders, 12.06, anxiety-related disorders,[13] and 12.09, substance abuse disorders.

---

[13] The Social Security Administration has developed a special technique for reviewing evidence of mental disorder claims. Listings 12.04 and 12.06 set out three categories which measure the severity and effects of the claimant's impairment, commonly referred to as the A, B, and C criteria. The A criteria of Listing 12.04 require the claimant to show the medically documented persistence, either continuous or intermittent, of depressive syndrome marked by four of nine specific traits; manic syndrome with at least three of eight traits; or bipolar syndrome with both manic and depressive traits. Similarly, the A criteria of Listing 12.06 require evidence of either generalized persistent anxiety accompanied by three of four stated symptoms; persistent irrational fear of specific objects, activities or situations and avoidance behavior; recurrent severe panic attacks, recurrent obsessions or compulsions; or recurrent or intrusive recollections of a traumatic experience.

To satisfy the B criteria of either 12.04 or 12.06, the claimant's affective disorder or anxiety-related disorder must be of such severity that it results in at least two of the following: "marked" (i.e., more than moderate but less than extreme) restrictions in activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration.

To satisfy the C criteria of Listing 12.04, the claimant must present medical evidence that his affective disorder has lasted at least two years, resulting in "more than a minimal limitation of ability to do basic work activities." The symptoms or signs of the affective disorder must be currently attenuated by medication or psychosocial support. The C criteria also require the claimant to show one of the following: repeated episodes of decompensation, each of extended duration; a residual disease process resulting in such marginal adjustment that even minimal increases in mental demands or change in the environment would be predicted to cause the individual to decompensate; or a current history of one or more years' inability to function outside a highly supportive living arrangement and an indication of the continued need for such an arrangement. The C criterion of Listing 12.06 is slightly different, requiring the claimant to show a "complete inability to function independently outside the area of one's home."

To meet Listing 12.04, the claimant must satisfy the A criteria plus two of the four B criteria, or, alternatively, satisfy the C criteria, and to satisfy Listing 12.06, he must satisfy the A criteria and two of the four B criteria, or, alternatively, both the A and C criteria.

(Tr. 170.) He considered Plaintiff's affective disorder to be a medically determinable impairment that did not precisely satisfy the diagnostic criteria of either depressive syndrome, manic syndrome, or bipolar syndrome, that is, a depressive disorder not otherwise specified. (Tr. 173.) He characterized Plaintiff's anxiety as generalized persistent anxiety accompanied by motor tension, autonomic hyperactivity or apprehensive expectation (Tr. 175) and further noted that Plaintiff demonstrated "behavioral changes or physical changes associated with the regular use of substances that affect the central nervous system" which should be taken into consideration when evaluating Plaintiff's affective disorders and anxiety-related disorders. (Tr. 178.) In reviewing the functional limitations caused by Plaintiff's mental conditions, he concluded that Mr. Rachuba was mildly limited in his activities of daily living, had moderate difficulties in maintaining social functioning and in maintaining concentration, persistence or pace, and had no repeated episodes of decompensation, each of extended duration. (Tr. 180.)

In the Mental RFC Assessment, Dr. Glover concluded that with a few exceptions, Plaintiff was no more than mildly limited in his understanding and memory and in his ability to sustain concentration and persistence, interact appropriately in social situations, and adapt to workplace requirements. Moderate limitations applied to his ability to understand, remember and

carry out detailed instructions; maintain attention and concentration for extended periods; complete a normal workday and workweek without interruptions; perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; receive criticism from supervisors; maintain socially appropriate behaviors; respond appropriately to changes in the work setting; and set realistic goals or make plans independently of others. (Tr. 184-185.)

In the narrative portion of Dr. Glover's report, he concluded that Mr. Rachuba could

> understand, retain and follow simple job instructions. .
> .maintain regular attendance and be punctual.  He is
> capable of asking simple questions and accepting
> instruction.  He can function in production-oriented jobs
> which required little independent decision making.  The
> limitations resulting from the impairment do not preclude
> the claimant from performing the basic mental demands of
> competitive work on a sustained basis.

(Tr. 186.)

Dr. Glover found Dr. Crabtree's report inconsistent with the totality of the evidence in the file and concluded some of his statements were "an overestimate of the severity of the claimant's functional restrictions." (Tr. 186.)  He further found that Dr. Crabtree had "relied heavily" on Plaintiff's subjective report of symptoms and limitations.  He made no obvious comments about the notes of Richard Valinsky, Ph.D., Plaintiff's psychotherapist at Psychiatric Care Systems, other than to refer to his reports of substance abuse.  (Tr. 182, 186.)

17

It is evident from the ALJ's analysis that she in turn relied heavily on Dr. Glover's conclusions, as shown by her almost verbatim adoption of language from his report, including his rejection of Dr. Crabtree's report because it was not consistent with "other medical evidence of record." However, the only other psychiatric medical evidence Dr. Glover reviewed[14] were the notes from Psychiatric Care Systems. At no point in his analysis does he explain how those notes are inconsistent with Dr. Crabtree's report or with non-medical evidence such as Plaintiff's own description of his activities of daily living. For example, the PCS notes refer to Plaintiff's report that he did not like to be alone, his "struggle. . .to accept himself," having "attained a way of thinking which precludes any change but give him a way of accepting himself," and the lack of "any suicidal impulses or thoughts." (Tr. 220, notes from August 31, 2006.) Dr. Crabtree's report includes references to "strongly negative thinking" about the possibility of changing his condition, "chronic feelings of guilt and worthlessness," his lack of "any kind of suicidal thought," pre-occupation with "what is going to happen to him now that he is

---

[14] In addition to the reports of Drs. Urrea and Cipriani which are discussed in the text above, the medical record also contained treatment notes from two psychiatric hospitalizations, the first on November 9-13, 2000, and the second on October 19-20, 2001. (*See*, respectively, Tr. 263-278 and 249-262.) Dr. Glover did not have access to these reports. The ALJ specifically requested them at the hearing (Tr. 49), apparently under the impression that the hospitalizations had occurred within three years of the hearing on May 16, 2008, and after Plaintiff's alleged onset date of March 2, 2005. The ALJ does not refer to these notes in her decision.

unable to work," and the fact that he "feels best at home." (Tr. 189-192.)   Contrary to Dr. Glover's findings that Plaintiff was able to function socially, Dr. Crabtree concluded his ability was below average in that he does not interact regularly with anyone beyond his immediate family, although he "did all right" with Dr. Crabtree during the interview.   In the same vein, the medical notes from Psychiatric Care Systems refer to the fact that "when he is in a crowd or noisy environment he becomes irritable" and to "a child-like dependency on his wife." (Tr. 223.)   Finally, although Dr. Glover concluded Plaintiff's ability to maintain concentration, persistence and pace were no more than moderately impaired, Dr. Crabtree described them all as "below average."   Dr. Crabtree specifically noted that Mr. Rachuba had "a hard time" subtracting 3 serially from 100, losing his place on three occasions, and was distracted while conversing.   He also reported observing a number of behaviors reflective of "a high level of anxiety," e.g., nervous tics, jetting of the jaw from side to side, looking away while he was talking, and "excessive breathing with his chest." (Tr. 190.) Dr. Valinsky's notes indicates that Plaintiff "has memory problems" (Tr. 223) and Dr. Oscar Urrea, Mr. Rachuba's psychiatrist, referred to his mood as anxious (Tr. 226, 229.)

In sum, Dr. Glover appears to have given short shrift to those portions of Dr. Crabtree's report and the Psychiatric Care System notes which would support a finding that Mr. Rachuba was disabled

and the ALJ appears to have adopted his conclusions without further analysis or consideration of other evidence. Moreover, the ALJ makes the conclusory statement that "Dr. Crabtree's opinion is without substantial support from the evidence of record," but fails to identify one item of evidence with which his report disagrees. Finally, the statement that his report has been given "appropriate weight" leaves the Court without a hint of the weight the ALJ actually assigned to the consultative examiner's findings.

Applying the above regulations pertaining to how medical opinions are to be evaluated to the reports of Drs. Glover and Crabtree, it is clear that Dr. Crabtree's opinion, based on his one-time consultative examination, should have been given greater weight than that of Dr. Glover. Dr. Crabtree had a first-hand opportunity to observe Plaintiff and concluded that his statements reflected "a high degree of reliability and validity" (Tr. 188), as compared to Dr. Glover's view that Mr. Rachuba's statements were only "partially credible" and "not consistent with all of the medical and non-medical evidence" in the file. (Tr. 186.) Moreover, the ALJ's reasoning that Dr. Crabtree's views should be discounted because he relied "heavily on the subjective report of symptoms and limitations" provided by Mr. Rachuba during the interview is not persuasive for two reasons. First, Dr. Crabtree reported his own objective findings about Plaintiff's anxious behavior, e.g., tics, lack of eye contact, and heavy breathing;

second, he provided the results of objective tests of abstract thinking, general intelligence and store of information, concentration, concentration, immediate and remote memory, judgment and insight. (Tr. 191-192.)

We recognize that "the mere memorialization of a claimant's subjective statements in a medical report does not elevate those statements to a medical opinion." Morris v. Barnhart, No. 03-1332, 2003 U.S. App. LEXIS 22054, * 12 (3d Cir. Oct. 28, 2003). Moreover, an ALJ may discredit a medical opinion "that was premised largely on the claimant's own accounts of [his] symptoms and limitations when the claimant's complaints are properly discounted." Id. However, in this case, Plaintiff's complaints have not been properly discounted because the ALJ found that his "medically determinable impairments could reasonably be expected to produce the alleged symptoms," yet failed to explain why she rejected his description of his limitations. (Tr. 13.)

        4.   The opinion of Dr. Oscar Urrea: Noticeably missing from the ALJ's discussion is any reference to a report prepared by Plaintiff's long-term treating psychiatrist, Dr. Oscar Urrea. (See Tr. 244-245.)  Dr. Urrea's report may be summarized as follows:

Mr. Rachuba initially consulted with Dr. Urrea in December 2005, shortly after his release from Lakewood Hospital, a private psychiatric hospital in Canonsburg, Pennsylvania, to which he had been admitted because of depression and substance abuse.  Dr. Urrea

prescribed Zoloft, an antidepressant, and continuing outpatient treatment.   Soon after the doctor's initial diagnosis of major depression complicated by substance abuse, Mr. Rachuba's pattern of mood swings, negative impulsivity and anger led Dr. Urrea to change his diagnosis to bipolar disorder and to prescribe lithium carbonate. Dr. Urrea further stated that during the ten years[15] in which he had been treating Mr. Rachuba, Plaintiff went through "hypomanic periods in which he would use substances, discontinue working and become quite belligerent at home."   (Tr. 244.) Additional adjustments in his medications were made, eventually settling on Wellbutrin.   Dr. Urrea concluded that despite having the support of his wife, psychotherapy, and medication,

> Mr. Rachuba continues quite fearful, dependent on his wife and insecure. . . .
>
> [He] does not suffer from a psychotic disorder.   However, his mood disorder has been so prevalent that it has interfered with his social judgment to the point that he finds himself unable to hold onto a job, having been threatened by his wife with divorce not once but several times because of his impulsivity and in general unable to perform as expected socially considering his level of education and social development.

---

[15]   There is an obvious inconsistency in Dr. Urrea's letter which states that Mr. Rachuba initially consulted with Dr. Urrea in December 2005 but also states that he had been treating Plaintiff for "the previous ten years."   The last statement is consistent with Plaintiff's testimony at the hearing that he had been under psychiatric care for more than ten years.   (Tr. 27.)   There is also evidence that Dr. Urrea had treated Mr. Rachuba prior to his admission to Washington Hospital in November 2000, i.e., a reference to the fact that Mr. Rachuba had a "known history of bipolar disorder and has been known to me at the office."   (Tr. 263-265.) On remand, if this discrepancy is material, it should be resolved.

> At this point and after psychotherapy and psychopharmacotherapy for over ten years at my practice, it is clear to me that Mr. Rachuba is in such a way that he cannot reliably perform his tasks eight hours per day. It is my opinion at this time that Mr. Rachuba is totally and permanently disabled from performing any kind of employment as a result of his mood disorder. The opinion expressed was made with a reasonable degree of medical certainty.

(Tr. 244-245.)

Setting aside for the moment Dr. Urrea's conclusions regarding Plaintiff's total and permanent disability,[16] the ALJ's complete omission of any discussion of this report is a major concern. We recognize that an ALJ is not required to cite to every item of evidence but she is, at a minimum, required to articulate her analysis for a particular line of evidence. Phillips v. Barnhart, No. 03-2236, 2004 U.S. App. LEXIS 4630, *14, n.7 (3d Cir. Mar. 10, 2004), citing Green v. Shalala, 51 F.3d 96, 101 (7th Cir. 1995). In the absence of such an articulation, this Court is unable to conduct the necessary substantial evidence review.  An ALJ's decision that fails to recognize and reconcile evidence of disability from a treating physician is not supported by

---

[16] A medical statement or opinion expressed by a treating source on a matter reserved for the Commissioner, such as a statement that the claimant is "disabled" or "unable to work," is not dispositive or controlling.  Adorno, 40 F.3d at 47-48.  However, while medical opinions on matters reserved for the Commissioner are not entitled to "any special significance," they must always be considered. 20 C.F.R. § 404.1527(e)(1-2).  See also Social Security Ruling 96-5p, "adjudicators must always carefully consider medical source opinions about any issue, including opinions about those issues that are reserved to the Commissioner," and such opinions "must never be ignored. . . ."  (Emphasis added by the Court.)

substantial evidence.   *See* <u>Fargnoli v. Halter</u>, 247 F.3d 34, 43-44
(3d Cir. 2001); <u>Cotter v. Harris</u>, 642 F.2d 700, 707 (3d Cir. 1981).
The omission of any discussion of the long-term treating
psychiatrist's conclusions about Plaintiff's mental health
limitations, which normally should have been given great, if not
controlling weight, is reason alone to remand this case for further
consideration.

     5.   *The ALJ's rejection of Dr. Cipriani's report:*   Dr.
Urrea's opinion is entirely consistent with that of Plaintiff's
primary care physician, Dr. A. J. Cipriani. (*See* Tr. 246-248.) The
ALJ noted this report but rejected it because "Dr. Cipraini [sic]
is not a mental health professional and his opinion is inconsistent
with the evidence of record."   (Tr. 14.)

    In his report, Dr. Cipriani noted that Mr. Rachuba had been
under his medical care since February 21, 1997, more than ten years
at the time the report was written.   Although he had treated
Plaintiff for several medical conditions, Dr. Cipriani concentrated
on his psycho-emotional state, commenting that Mr. Rachuba had an
early history of chemical abuse resulting from a "serious emotional
imbalance" and an attempt to self-medicate.   He described Mr.
Rachuba's condition as "a severe anxiety-depressive disorder,"
reflected in a very diminished attention span, frequent memory
lapses, and "frequent bouts of irritability and tension marked with
extreme acting out behavior."   (Tr. 247.)   He concluded that

because Plaintiff's affect "is markedly distorted," he would not be able to interact in the workplace "under any circumstances" or maintain an eight-hour workday.   Dr. Cipriani explained that while Mr. Rachuba experienced "phases of improvement," these were not sustained for any length of time.   He considered Plaintiff's prognosis poor due to the fact that he had not made any significant recovery in the 11 years he had been treated.   Dr. Cipriani concluded that "unfortunately, this is a young man who, with reasonable medical certainty,. . . will be ineffective in the work force.   I consider him totally disabled from working in any occupation."   (Tr. 247-248.)

The fact that Dr. Cipriani is a general practitioner rather than a specialist in psychology is not sufficient reason to reject his conclusions outright.   Rather, the fact that an opinion is rendered by a primary care physician rather than a specialist in a particular field goes to the weight which should be given that opinion.   In fact, the ALJ is directed to consider all relevant evidence, including "medical records, observations made during formal medical examinations, descriptions of limitations by the claimant and others, and observations of the claimant's limitations by others."   Fargnoli, 247 F.3d at 41.[17]   Moreover, the ALJ once

---

[17]   In connection with the last of these points, "observations of the claimant's limitations by others" we also note the absence from the ALJ's opinion of any recognition that Plaintiff's wife, Dyan Rachuba, testified at the hearing.   She confirmed that Plaintiff was unable to drive alone, in part because he became confused and anxious; that when she was out of town on business, Plaintiff stayed with his

again fails to explain why Dr. Cipriani's opinion is inconsistent with the evidence of record, or to point out any such evidence.

In a recent case decided by the United States Court of Appeals for the Third Circuit, the Court reiterated its long-standing position that an ALJ's disability determination is not supported by substantial evidence when he fails to give appropriate weight to the opinion of the claimant's treating physicians and instead improperly relies on the opinion of a non-examining psychologist. Brownawell v. Comm'r of Soc. Sec., 554 F.3d 352, 355 (3d Cir. 2008), citing Morales, 225 F.3d at 317, and Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir. 1999), for the principles that an ALJ should give "treating physicians' reports great weight, especially when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time," and that contradictory medical evidence is required for an ALJ to reject a treating physician's opinion outright.

## V.   FURTHER PROCEEDINGS

Under 42 U.S.C. § 405(g), a district court may, at its discretion, affirm, modify or reverse the Secretary's final

---

parents because he cannot stand to be alone; was frequently confined to bed "for days at a time" due to back pain; and had "sporadic bouts" of substance abuse, difficulty with short-term memory, and mood swings. (Tr. 41-46.)  The ALJ is expected to address and weigh all of the non-medical as well as the medical evidence before him or her, including the testimony of additional witnesses.  Burnett, 229 F.3d at 122, noting that the ALJ had failed to mention the testimony of the claimant's husband and neighbor who were there to bolster her credibility.

decision with or without remand for additional hearings.  However, the reviewing court may award benefits "only when the administrative record of the case has been fully developed and when substantial evidence on the record as a whole indicates that the plaintiff is disabled and entitled to benefits."  Krizon v. Barnhart, 197 F. Supp.2d 279, 291 (W.D. Pa. 2002), *quoting* Podedworney v. Harris, 745 F.2d 210, 222 (3d Cir. 1984).

In the ALJ's decision here, the lack of any discussion of Dr. Urrea's report leaves this Court unable to determine if his opinions were simply overlooked or if it was considered but rejected.  *See* Burnett v. Commissioner, 220 F.3d 112, 121 (3d Cir. 2000) (an ALJ must "consider and explain his reasons for discounting all of the pertinent evidence before him in making his residual functional determination.")  Where such an analysis is missing, this court cannot perform the "meaningful review" required. *See* Poulos v. Comm'r of Soc. Sec., 474 F.3d 88, 93 (3d Cir. 2007), *citing* Burnett, id. at 119 (the "ALJ must provide a sufficient framework of reasoning for a court to conduct a 'meaningful judicial review' of the ALJ's decision.")  Similarly, the total rejection of Dr. Cipriani's report because he was not a mental health professional was improper inasmuch as the ALJ should have considered all the evidence of record.  Other errors such as the complete omission of any discussion of the criteria of the relevant Listings, the lack of a residual functional capacity

27

assessment, the failure to incorporate any limitations resulting from Plaintiff's non-serious impairments and conclusory statements about Plaintiff's credibility[18] leaves the Court unable to determine if the ALJ's conclusion that  Mr. Rachuba was not disabled truly rests on substantial evidence.[19]   We therefore remand this matter for further consideration by the Commissioner.

An appropriate order follows.

March  **30** , 2009

_William L. Standish_
William L. Standish
United States District Judge

---

[18] In most cases, a district court will give great deference to the ALJ's credibility determination because he or she is best equipped to judge the claimant's demeanor and attitude. See Reefer v. Barnhart, 326 F.3d 376, 380 (3d Cir. 2003).   However, the Court must review the factual findings underlying the ALJ's credibility determination to ensure that it is "closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings."  Hackett v. Barnhart, 395 F.3d 1168, 1173 (10th Cir. 2005) (internal quotation omitted.) Here, we find the facts of the case, read objectively, do not support the ALJ's credibility analysis.

[19]   The Court is cognizant of the underlying references to Plaintiff's substance abuse problems.  Dr. Glover identified Listing 12.09, substance abuse, in his report (Tr. 178), and it is repeatedly mentioned by Dr. Urrea and Dr. Valinsky (see, e.g., Tr. 222-223), but the ALJ fails to address this impairment at all.  The Social Security Administration has established that "[a]n individual shall not be considered to be disabled. . . if alcoholism or drug addiction would (but for this subparagraph) be a contributing factor material to the Commissioner's determination that the individual is disabled."   42 U.S.C. § 423(d)(2)(C); 20 C.F.R. § 404.1535.  The Administration has set out a specific process by which disability that may arise from a combination of physical and/or mental impairments plus substance abuse is to be analyzed.  See Debaise v. Astrue, CA No. 09-591, 2010 U.S. Dist. LEXIS 13004, *35-*41 (W.D. Pa. Feb. 16, 2010) (describing the process to be followed), and Lang v. Barnhart, CA No. 05-1497, 2006 U.S. Dist. LEXIS 95767, *11-*17 (W.D. Pa. Dec. 6, 2006) (same).  No such analysis was performed in this case despite strong medical evidence that substance abuse was an ongoing problem for Mr. Rachuba.